ALEX G. TSE (CABN 152348)
Acting United States Attorney
BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division
KAREN BEAUSEY (CABN 155258)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6598
    FAX: (415) 436-7234
    Karen.Beausey@usdoj.gov

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
|     Plaintiff, | |
| v. | **VERIFIED COMPLAINT FOR FORFEITURE** *IN REM* |
| $78,080 in United States Currency, | |
|     Defendant. | |

    The United States of America, by its attorneys, Alex G. Tse, United States Attorney, and Karen Beausey, Assistant United States Attorney for the Northern District of California, brings this complaint and alleges as follows:

## NATURE OF THE ACTION

    1.    This is a judicial forfeiture action, as authorized by Title 21, United States Code, Section § 881(a)(6), involving the seizure and forfeiture to the use and benefit of the United States of America the following property:

    $78,080 in United States Currency seized by law enforcement officers from Kevin CAIN on or about January 29, 2018, and currently in the custody of the United States Drug Enforcement Administration ("DEA");

(hereinafter, "Defendant Property"), as property constituting, or derived from, any proceeds obtained,

directly or indirectly, as a result of a violation of 21 U.S.C. §§ 841 and/or 846, and thereby forfeitable

pursuant to 21 U.S.C. § 881(a)(6).

## JURISDICTION AND VENUE

2.     This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355, and 21 U.S.C.

§ 881(a)(6).

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because the acts

or omissions giving rise to the forfeiture occurred in this district and the Defendant Property is located in

this district.

4.     Intra-district venue is proper in the San Francisco within the Northern District of

California.

## PARTIES

5.     Plaintiff is the United States of America.

6.     The Defendant Property consists of $78,080 in United States Currency seized by law

enforcement officers from Kevin CAIN on or about January 29, 2018 and currently in the custody of the

DEA.

## FACTS

7.     On January 29, 2018, Cincinnati DEA Task Force Agent Eli Sautter received information

from a confidential source (CS) that on January 28, 2018, Kevin CAIN had made a round-trip

reservation to fly from Chicago O'Hare International Airport to San Francisco International Airport

(SFO) on January 29, 2018, via American Airlines flight #2639.  CAIN was scheduled to return back to

Chicago the following day (January 30, 2018), on a flight departing SFO at 4:23 p.m.  The CS also

reported that Cain had paid for the ticket with a credit card via an outside travel agent, and that he had

one checked-in piece of luggage.  TFA Sautter, in turn, passed that information to DEA agents at SFO.

8.     Following receipt of TFA Sautter's information on January 29, 2018, San Francisco agents conducted a computer records check of CAIN and learned that he had been arrested on several occasions for a variety of offenses, including two separate arrests (in 2006 and 2007) for possession of marijuana and one arrest in 2010 for manufacture/distribution/possession of marijuana for sale.

9.     CAIN's flight was scheduled to land at SFO that afternoon at approximately 4:23 p.m.  In light of the information related to them by TFA Sautter and CAIN's criminal history, San Francisco DEA agents decided to meet CAIN at SFO and to seek an interview with him regarding the purpose of his travel to California.

10.    Accordingly, shortly before CAIN's flight was due to arrive at SFO DEA agents established surveillance at the arrival gate.  Agents observed CAIN emerge from the jet way with no carry-on baggage, and proceed to the baggage claim area.  CAIN arrived at the American Airlines luggage carousel at approximately 4:31 p.m., and after a short wait retrieved a duffle bag from the carousel and began to walk toward the terminal exit.

11.    At that time, at approximately 4:39 p.m., Task Force Agent Blake Molyneux called out to CAIN by saying "Kevin." CAIN stopped approximately 10 feet from the exit door and turned his attention to TFA Molyneux.  TFA Molyneux and TFA Ron Drake approached CAIN, identified themselves as agents with the DEA, and presented him with their agency issued credentials.  The agents were in plain clothes, not uniforms, and were not visibly displaying firearms or other weapons.  TFA Molyneux asked if the agents could speak with CAIN, and CAIN agreed.

12.    TFA Molyneux informed CAIN that he was not under arrest and that he was free to leave at any time, and CAIN appeared to understand TFA Molyneux's statements.  The agents stood at a conversational distance from CAIN, and throughout the interview, CAIN had a clear, unobstructed path to walk away from the agents if he chose to do so.

13.    TFA Molyneux asked CAIN if he was traveling alone, and CAIN confirmed that he was

3

traveling alone.  CAIN stated he had arrived at SFO from Chicago, and stated that he resided in

Chicago.  TFA Molyneux asked CAIN why he had traveled to California, and CAIN stated he was going

to a wedding in Santa Rosa.  TFA Molyneux asked where the wedding was being held, but CAIN stated

he was not sure of the exact location.  When asked what time the wedding was to take place, CAIN was

unable to provide the time of the wedding, or any other details about the wedding.  While speaking with

CAIN TFA Molyneux noted that CAIN appeared to be very nervous and that his answers were vague.

14.     TFA Molynuex found CAIN's statement that he had flown to California to attend a

wedding to be implausible.  CAIN's inability to provide any details regarding the wedding aroused TFA

Molyneux's suspicion that no such wedding was taking place.  Also, CAIN's flight itinerary made clear

CAIN was only scheduled to be in California for approximately 24 hours, and based upon TFA

Molyneux's knowledge of traffic patterns in the Bay Area he believed CAIN would not make it to Santa

Rosa for at least two hours if he left immediately.

15.     TFA Molyneux explained to CAIN that he and TFA Drake were part of a Task force

attempting to control the drug trafficking trade operating through the use of airports.  He asked CAIN if

CAIN was carrying any drugs or anything illegal, and CAIN replied he was not.  TFA Molyneux asked

if CAIN had ever been arrested and CAIN stated he had not.  TFA Molyneux knew this not to be true as

the computer check of CAIN's criminal history had already revealed a number of previous arrests.

16.     TFA Molyneux asked CAIN if he would consent to a search of his duffle bag.  CAIN did

not immediately answer yes or no, but rather asked if he had to consent.  TFA Molyneux explained

CAIN had the right to refuse the consent for the search if he wanted.  TFA Molyneux asked CAIN if

there was a reason he did not want agents to search his duffle bag, and CAIN replied "I have a little cash

with me."  TFA Molyneux asked CAIN how much money he had with him, and CAIN replied he had a

couple thousand.  TFA Molyneux noted that if the money was legitimately earned or intended for a

lawful purpose, there was no issue with carrying money through the airport.  CAIN stated he understood

and when TFA Molyneux asked again whether CAIN would consent to a search of his duffle bag, CAIN

replied, "OK, I was just worried about the money." CAIN also placed the duffle bag on the ground at

TFA Drake's feet as further indication of his consent.

17.     Based upon CAIN's consent, TFA Drake attempted to search CAIN's duffle bag, but was

unable to do so because the bag was secured with a padlock. TFA Drake asked CAIN if CAIN had the

key to the padlock, and CAIN removed the key from his pants pocket and began trying to unlock the

padlock. However, CAIN's hands were shaking so badly that he had a very difficult time placing the

key into the lock. CAIN had to try at least a dozen times to insert the key into the lock before he

succeeded in doing so. CAIN eventually did manage to open the padlock, and he then unzipped the

duffle bag and stood back to allow TFA Drake access to the bag.

18.     During that time, TFA Molyneux continued to converse with CAIN. TFA Molyneux

observed that CAIN was not only shaking badly, he was also sweating profusely even though the

temperature was mild that day and they were standing in the air conditioned baggage carousel area

inside the airport.

19.     TFA Drake searched CAIN's bag. He noticed that there were only a few items of

clothing in the duffle bag, and that the clothing was not consistent with wedding attire. Rather, most of

the clothing items were t-shirts and several of the t-shirts were being used to conceal something. Upon

further inspection TFA Drake found numerous stacks of rubber banded United States currency

concealed within the t-shirts.

20.     In his training and experience, TFA Molyneux recognized the manner in which the

currency was packaging as consistent with narcotics smuggling. Specifically, the bundling of the money

in rubber-banded stacks and the concealment of the money within clothing in luggage were methods of

transporting money that TFA Molyneux had observed used by narcotics traffickers in other

investigations in which he had worked.

21.     Upon seeing the total number of stacks of money, TFA Molyneux believed CAIN's statements that he was carrying "a little cash" and "a couple thousand" were not accurate.  TFA Molyneux again asked CAIN how much money CAIN had with him, and CAIN replied he had "maybe around $50,000."  CAIN claimed not to know the exact amount of money he was carrying in his duffle bag.  When asked why he had lied about the total amount of money in his possession, CAIN could not provide a reason, nor could he explain why he did not know the exact amount if the money was his.

22.     TFA Molyneux asked CAIN why he had so much money with him.  CAIN replied that he might buy some cars while in the area.  TFA Molyneux again asked CAIN about the details of the wedding he planned to attend, but CAIN could not provide any details other than he was going to attend a wedding in Santa Rosa.  He could not provide reservations for a hotel or for a rental car, he did not know exactly where he had to go, and he could not state the names of the people getting married or how he was related to the wedding party.

23.     TFA Molyneux asked again why CAIN had so much money with him when he was just in California to attend a wedding.  CAIN replied he was going to use the money to buy two Audi's.  However, when asked for details about the planned purchase CAIN was unable to provide any details about the vehicles, the name or number of the person selling the vehicles, or even the location of the anticipated purchase other than that the vehicles were in Santa Rosa.  CAIN then admitted he did not have any prior arrangements with a seller of any vehicles prior to flying to San Francisco, and claimed he was just starting out in the business of buying and selling cars.  Based on his training and experience, TFA Molyneux recognized this as a common cover story that smugglers often provide to explain why they carry large sums of currency, and he asked CAIN for more information about his car buying business.  When asked if he worked for a company or for himself, CAIN stated he worked for himself with a partner, who he identified as "Rashad Langdon."  CAIN did not have any business cards or anything related to a car buying/selling business, or any other business.  He said he did not have a

business name, and he did not have any paperwork with him regarding the purchase or sale of vehicles (such as bills of sale, DMV transfer paperwork, registration paperwork, etc.). In addition, CAIN could not provide any information regarding "Rashad Langdon," and claimed he did not know where "Langdon" lived, his birthday, his telephone number, or even how to spell his name.

24.     CAIN stated that the money was legitimate, but could not show any bank statements, receipts, or other documentation evidencing where or how he had obtained the money. TFA Molyneux asked CAIN about his finances, and CAIN produced a copy of his pay stub from the middle of November 2017 which indicated his gross income was $39,284. CAIN estimated he made another $5000 in 2017 working as a temporary laborer with Batory Foods, and that his yearly income was approximately $45,000. CAIN stated he believed he had declared $40,000-$50,000 each year for the past several years on his income tax returns. TFA Molyneux asked CAIN how he had acquired so much cash based upon his income over the past several years, and CAIN said he had saved the money from working. TFA Molyneux asked if CAIN had withdrawn the cash from a bank and CAIN stated he had withdrawn $3000 or $4000 from his Bank of America account prior to flying to SFO. He did not have a withdrawal receipt but added the account was now empty because he had removed the money recently.

25.     TFA Molyneux explained to CAIN that he believed CAIN was in the Bay Area to purchase drugs and that he was carrying the currency for that purpose, or that the money was the proceeds of drug sales. CAIN did not protest the seizure and did not provide any further explanation for being in possession of such a large amount of cash.

26.     The currency was sealed in evidence bags to be counted later at Bank of America, and CAIN was provided with a receipt. TFA Molyneux explained the asset forfeiture process to CAIN, and he and TFA Drake provided CAIN with their business contact information. The interview ended at approximately 5:02 p.m.

27.     Immediately after separating from CAIN, TFA Molyneux transported the bags containing

the seized currency to a ticket kiosk near United Airlines luggage carousel #1 in Terminal 3 at SFO. Earlier that afternoon, at approximately 2:30 p.m., TFA Drake had his certified drug detection canine ("Logan") examine the area around carousel #1 and the surrounding area.  At that time Logan did not alert to any drug odors in the area.  At approximately 5:10 p.m., after the bag containing the currency seized from CAIN had been placed behind the ticket kiosk, TFA Drake again had Logan examine the area.  Logan alerted to the odor of drugs when he examined the area behind the ticket kiosk, indicating to TFO Drake that the odor of narcotics was emanating from the currency.

28.     On January 30, 2018, the currency was transported to Bank of America in San Mateo, California.  The Bank verified that the amount of currency seized from CAIN's duffle bag was $78,080.

### CLAIM FOR RELIEF

29.     The United States incorporates by reference the allegations in paragraphs 1 through 28 as though fully set forth herein.

30.     Title 21, United States Code, Section 841(a) prohibits the manufacture, distribution, or dispensing, and possession with the intent to distribute a controlled substance.

31.     Title 21, United States Code, Section 881(a)(6), provides, in part, for the forfeiture of all moneys, securities or other things of value furnished or intended to be furnished to a person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys and securities used or intended to be used to facilitate any violation of Title 21, United States Code, Chapter 13, Subchapter I, including violations of Title 21, United States Code, Sections 841(a) and 846.

32.     In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the Defendant Property represents proceeds traceable to money, securities or other things of value furnished to a person in exchange for a controlled substance, in violation of Title 21, United States Code, Sections 841(a) and 846, and thus subject to forfeiture under Title 21, United States Code, Section 881(a)(6).

1       WHEREFORE, plaintiff United States of America requests that due process issue to enforce the

2   forfeiture of the Defendant Property; that notice be given to all interested parties to appear and show

3   cause why forfeiture should not be decreed; and that judgment of forfeiture be entered; that the Court

4   enter judgment forfeiting the Defendant Property; and that the United States be awarded such other

5   relief as may be proper and just.

6

7   DATED: July 5, 2018              Respectfully submitted,

8                               ALEX G.TSE

9                               Acting United States Attorney

10

11

12                               KAREN BEAUSEY

                            Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Drug Enforcement Administration Task Force Agent Blake Molyneux, state as follows:

1.     I am a Task Force Agent with the Drug Enforcement Administration.  I am a case agent assigned to this case.  As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2.     I have read the Complaint and believe the allegations contained therein to be true.

*        *        *        *        *

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5TH day of July, 2018, in SAN FRANCISCO , California.

Task Force Agent Blake Molyneux
Drug Enforcement Administration

JS-CAND 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Karen Beausey
450 Golden Gate Ave., 9th Floor
San Francisco, CA 94102

## DEFENDANTS

$78,080 in United States Currency

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 190 Other Contract | | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 893 Environmental Matters |
| | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation–Transfer

☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 21, United States Code, Section 881(a)(6)

Brief description of cause:
Drug Related Forfeiture

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*

☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE 07/05/2018

SIGNATURE OF ATTORNEY OF RECORD